# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Crim. No. 17-611-1 (ADC)** |
| **BENJAMIN MELENDEZ RIVERA,** | |
| **Defendant.** | |

## OPINION & ORDER

Before the Court is defendant Benjamín Meléndez-Rivera's ("defendant") motion to suppress. **ECF No. 207**.[1] The government responded in opposition. **ECF No. 210**. The Court held an evidentiary hearing on the matter on August 22, 2019. **ECF No. 224**. For the following reasons, the motion to suppress is **DENIED**.

## I.    Background

Defendant is charged with one count of conspiracy to interfere with commerce by robbery, 18 USC 1951, two counts of interference with commerce by robbery, 18 U.S.C. 1951-2, two counts of possession and discharge of firearms in furtherance of a crime of violence, 18 U.S.C. 924(c)(1)(A(iii) and 924 (j), and two counts of being a prohibited person (convicted felon) in possession of a firearm, 18 U.S.C. 922 (g)(1). **ECF No. 26**. The charges arise from events that

---

[1] Per the Court's ruling during the status conference held on August 7, 2019, Defendant's request to suppress information pertaining to historical cell site records was settled. *See* **ECF Nos. 201, 215, 216**. The underlying factual scenario was clarified during the conference and consequently the issue regarding cell site records is considered either moot or denied.

took place in March and October 2017, and include the robbery of an armored vehicle on March 30, 2017 at a Banco Popular in Añasco which resulted in a shoot out and the death of two bystanders and the wounding of an armed vehicle guard.

Defendant seeks to suppress the statements obtained by Federal Bureau of Investigation ("FBI") agents after execution of search warrants on defendant's residence, cell phones and vehicle arguing that he was interrogated in a custodial situation as defined in *Miranda* and without being duly advised of his constitutional rights at the beginning of the interview. *See* **ECF No. 207**. He further contends that he did not waive his *Miranda* rights voluntarily and knowingly when he signed the waiver during the interview with FBI agents. *Id.* The government holds that defendant was not subject of a custodial interrogation, that during the interview he was repeatedly advised that he was free to leave, was not under arrest and later voluntarily waived his *Miranda* rights. **ECF No. 210**. The parties recount vastly different versions of the facts as they pertain to the circumstances surrounding the interview by FBI agents, especially as to whether defendant was wearing handcuffs at the time, was involuntarily taken to the agent's vehicle, was advised that he was free to leave and not under arrest, and defendant's signing of the waiver of his *Miranda* rights.

The Court conducted an evidentiary hearing on August 22, 2019. During the evidentiary hearing, the Court heard testimony from FBI Special Agent Luis A. Feliciano ("Agent Feliciano"); FBI Special Agent Guillermo González ("Agent González"); defendant's next-door neighbor, Luz Ramos-Vázquez ("Luz"); defendant's wife, Zoraida Ayala Vázquez ("Zoraida");

and defendant, about the facts surrounding the execution of the search warrant and defendant's

interview with FBI agents.

## II.      Findings of Fact

On November 8, 2017, approximately 25-30 federal and state agents from various

agencies, including the Drug Enforcement Agency ("DEA"), the FBI and Puerto Rico Police

Department ("PRPD"), arrived around 4:30 a.m. at defendant's residence to execute search

warrants for his residence, cell phones, and vehicle (a red Chevrolet Silverado pickup). Agents

Feliciano and González testified about their experience in the preparation and execution of the

search warrant.

### a.   Agents Feliciano's and González's testimony

Agent Feliciano has been an FBI Special Agent for approximately 22 years, 8 of those as

part of the San Juan SWAT team.[2] He explained that being a SWAT team member is a voluntary

duty which involves training on conducting entries on residences where subjects show a high

propensity for violence and access to weapons. He has been involved in close to 50-100 search

warrants as an FBI agent. Throughout his tenure, his assignments ranged from police corruption

investigations to violent crimes, criminal organized crime, counterterrorism, and domestic

terrorism. He is currently the program manager of the domestic terrorism operations unit at the

FBI's headquarters in Washington D.C.

---

[2] Agent Feliciano testified that he was a member of the SWAT team between the years 2000-2008.

Agent Feliciano was in Puerto Rico in November 2017 as part of a task force sent after the passing of Hurricane Maria to provide humanitarian and civic assistance. He assisted the Western Regional Office of the FBI in any ongoing investigations, including the investigation into the armored truck robbery that took place on March 30, 2017. Agent Feliciano was assigned as team leader in the execution of the search warrants for defendant's residence, cell phones and vehicle on November 8, 2017. Agent Feliciano's role as team leader garnered the responsibility of ensuring the perimeter of defendant's residence was secure and avoiding anyone from coming in or leaving the perimeter to ensure their safety while law enforcement did their job, namely, breach and secure the residence.

Agent Feliciano explained that entry into a residence operates based on a search or arrest warrant. Agents must first have a positive breach of the residence, to be able to see inside the residence and avoid any harm to the agents from potentially armed and dangerous occupants. A positive breach can be performed busting down a door or window. Once there is a positive breach, agents enter the premises and handcuff the occupants, who are placed in an area where they can be observed until the residence is cleared and secured, ensuring there is no threat inside the residence. If the occupants are not subject of an arrest, after the residence is cleared, they are uncuffed and extracted from the residence. The residence is then turned in to the FBI Evidence Response Team who take over the scene and execute the search.

Agent González has been an FBI Special Agent for the past 10 years and is currently the supervisor for the Ponce Regional office. He has worked in the investigation of violent crimes

(bank robberies and armed car robberies), crimes against children, kidnappings, and public

corruption. He has participated in no less than 20 search warrants. On November 8, 2017, he

was the on-scene commander for the execution of the search warrant on defendant's residence,

cell phone and vehicle. Agent González was tasked with overseeing the whole operation and

ensuring that procedures were followed. Before the execution of the search warrants, Agent

González knew defendant was the object of multiple investigations regarding violent armored

car robberies.

Prior to the intervention on November 8, 2017, the team met at the Old Naval Base in

Vega Baja for briefing.  During the briefing, agents received a synopsis of the case, discussed the

logistics of approaching the residence and were warned about the dangerousness of the

situation and potential propensity for violence from the occupants, this considering the robbery

setting that led to the issuance of the search warrants. Agent González noted that agents were

told to "approach the house with caution as the persons residing in the house were considered

armed and dangerous." The DEA SWAT team was set to breach and enter the residence and

secure the location before the FBI Evidence Response Team conducted the search of the

residence, cell phones and vehicle.

The area surrounding defendant's residence was blocked during the execution of the

warrants from approximately 4:30 a.m. until noon. According to Agent Feliciano, once the

perimeter was set, the DEA SWAT team breached and secured the residence albeit he did not

visually witness the actual breach. Agent González testified that he observed first hand when

the DEA SWAT team conducted what he described as a dynamic entry;[3] they approached,

announced their presence, breached the main entry door and glass,[4] and entered the residence.[5]

Once inside the residence, they detained and secured the persons inside. Agent González

testified that during this process, the occupants of the residence were handcuffed, based on

standard procedure. He explained that this ensured the safety of the occupants and agents while

the residence was secured, *i.e.* confirm that there are no weapons or threat to the agents or the

occupants.

When Agent González initially saw the occupants – including defendant – they were

brought outside of the residence, handcuffed, to an area in the carport between the white SUV

and the red Silverado pickup parked in the carport. The occupants were standing up. He

observed when the occupants were uncuffed by agents. The DEA SWAT agents then handed

the scene over to the FBI to conduct the search warrant. At that time, Agent González conducted

a walk through of the residence.

Similarly, after the residence was cleared, Agent Feliciano received a tour of the

residence. Agent Feliciano described that after touring the residence, he exited the residence and

saw defendant and various occupants standing in front of the residence's carport and none of

---

[3] He was across the street at a safe distance and could see the main entrance of the residence where DEA SWAT team agents breached the residence's main door and entered through the carport door.

[4] Agent González identified the main door that was breached in Gov't Ex. 1. The glass portion of the metal door was shattered.

[5] He testified that he could not see the carport door area and did not see agents enter the residence through that door.

them were handcuffed. At that time, Agent Feliciano and Special Agent Jarrett Marion approached defendant and asked if they could speak to him. Defendant responded in the affirmative. Agents Feliciano and Marion then asked defendant if they could speak in Agent Feliciano's car, an unmarked four-door sedan parked approximately 30-50 meters west of defendant's residence. Defendant agreed.

Agents Feliciano, Marion and defendant walked to Agent Feliciano's car.[6] Agent Feliciano sat next to defendant in the back seat of the sedan. Agent Feliciano noted that defendant was not wearing handcuffs. He also explained that he and Agent Marion carried only their concealed weapons in their hip holsters[7] and were not wearing body armor or holding long guns – those were secured in the trunk of the sedan after the residence was cleared. Before starting the interview, Agent Feliciano told defendant that the interview was voluntary, that he could stop the interview and he was free to leave, that he was not in custody, and offered him a bottle of water during the interview.

Agents Feliciano and Marion asked defendant about the occupants in his residence at the time of the execution of the search warrant, the vehicles parked in the carport, defendant's cell phone as well as the cell phone of each occupant. Defendant provided his phone number to the agents and stated that he was the only user. He also confirmed that he was the sole driver of the

---

[6] Agent González confirmed that he saw Agents Feliciano and Marion approach defendant and strike up a conversation with him, and that they later relocated to a vehicle that was located to the right of the residence. He noted that defendant was not wearing handcuffs at that time. Agent González was not part of the conversation.
[7] This was further confirmed by Agent González's testimony.

red Silverado pickup in the carport. Agent Feliciano then reminded defendant for a second time that the interview was voluntary, that he was not in custody and he could leave at any time.

The agents then delved into defendant's background. At one point, defendant admitted he was a convicted felon.[8] Considering defendant's declaration that he was a convicted felon and that a weapon was found inside the residence during the search[9], in what Agent Feliciano deems "an abundance of caution", he procured Form FD-395.15, in Spanish, which contained the *Miranda* rights and read defendant the contents of the form. **Gov't Ex. 4**. Defendant signed the form, which reads "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." **Gov't Ex. 4**. Agent Feliciano wrote 5:46 a.m. as the time when the *Miranda* warnings were administered to defendant. Defendant signed the document in the presence of both agents Feliciano and Marion; both agents signed the form at 5:48 a.m. Agent Feliciano stated that he never told defendant that he had to sign the document so that he could leave.

After advising defendant of his *Miranda* rights, the interview continued. Law enforcement agents showed, and defendant identified a series of photographs of himself and several other individuals believed to be his associates in the Añasco robbery and their respective

---

[8] Agent Feliciano stated that prior to the execution of the search warrant, he had not seen defendant's criminal record albeit he was aware defendant was a person of interest to the FBI since the early 2000's as possibly being involved in numerous armored truck vehicle robberies in the Metropolitan area. Also, Agent Feliciano was aware that search warrants were issued for defendant's cell phone and vehicle as part of the investigation into the Añasco robbery.

[9] The Court will not expand on this issue since the execution of the search and the evidence obtained during the search are not object of this motion.

vehicles. Agent Feliciano was aware that defendant and the individuals in the photographs were targets of the FBI investigation regarding the robbery in Añasco. Agents Feliciano and Marion wrote notes and initials in the photographs contemporaneously as they showed them to defendant and defendant explained the contents of each picture.

At one point, defendant told the agents that he no longer wished to speak to them. The agents told defendant he could leave the vehicle. Agent Feliciano made a note on the FD-395.15 Form of the time when defendant exited the vehicle, as 6:25 a.m. Defendant exited the vehicle and went to the front of his house where some of his family members were standing. Agent González testified that later that morning he saw defendant sitting on a chair in the house across the street from his residence, without handcuffs.

Agent Feliciano testified that he never threatened defendant or told him they were going to arrest his family. Agent Feliciano later drafted a memorandum (FD 302) containing defendant's statements and the agent's report on the events. **Gov't Ex. 14**. Both agents Feliciano and González confirmed that later that day defendant was arrested and handcuffed.

### b. Defendant's and Zoraida's testimony

Defendant and his wife Zoraida testified that after hearing loud bangs at around 4:30-4:45 a.m.[10], and the agents announced themselves as FBI, Zoraida opened the door that led to the residence's carport. They further testified that agents entered the residence via the carport

---

[10] Both defendant and Zoraida testified that they initially suspected that the noise and attempts to enter their residence was perpetrated by a potential robber.

door, informed they had a search warrant and asked whether there were weapons in the house.[11]

They further testified that the agents threw defendant on the floor, placed handcuffs on his back,

and handcuffed Zoraida[12]. According to defendant, after being handcuffed, agents lifted him off

the floor, took him out through the residence's door and into an SUV – located in front of his

neighbor's house - where they told him they were going to ask him some questions. Defendant

testified that agents did not tell him that he was free to leave and that he signed the *Miranda*

waiver because the agent told him that he could leave if he signed the form. After defendant

signed the waiver, the agent purportedly opened the door, took his handcuffs off and he saw

his wife, his stepdaughter and her husband in front of his neighbor's house. Defendant then

walked over to where his family members were standing.

     Meanwhile, after being handcuffed, Zoraida told agents she needed to use the restroom.

Two female officers took Zoraida to the bathroom in the master bedroom and took her handcuffs

off; they never put them back on. After exiting the bathroom and master bedroom area and on

her way out of the residence, Zoraida saw her son handcuffed in the dining room. Zoraida was

then taken to an SUV where the female officers asked her questions for approximately 45-50

minutes. Zoraida testified that when she exited the SUV, she saw defendant, her son in law and

son standing in front of their front neighbor's house, all of them without handcuffs, and the rest

---

[11] Zoraida informed the agents that her son in law had a gun and a permit for its use.
[12] Defendant's testimony suggests that Zoraida was also thrown to the floor, but her testimony does not support such contention.

of the family members also reappeared from "different angles".  Defendant and Zoraida testified

that after being interviewed by agents, they went to Luz's mother's house to drink coffee.[13]

### c.  Luz Ramos's testimony

Defendant's neighbor, Luz, testified that she was staying over at her mother's house[14] the

night prior to November 8, 2019 because her daughter, who lived on the second floor of her

mother's residence, was sick.  Luz stayed over that night in her daughter's apartment on the

second floor. At around 4:30-5:00 a.m., Luz heard "hard blows" or banging and she went to the

balcony outside the second-floor apartment, where she observed 25-30 officers around

defendant's residence, on the street and observed vehicles blocking the street. She contends that

she had visibility over the entire front part of defendant's residence because the balcony is

"high." She also testified that she stayed standing in the balcony for several hours observing

everything. Luz stated that she saw the agents attempting to enter the property through the door

in the carport. She further testified that she saw the "reflection" of defendant being picked up

from the ground with handcuffs in the back. She also saw agents take three minors, defendant's

son, step daughter Zoralis, Zoralis's husband, defendant and Zoraida to different vehicles at

around 5:15 a.m. According to Luz, all the adults were handcuffed in the back except Zoraida.

Luz purportedly saw defendant taken to a vehicle in handcuffs and later saw him get off the

---

[13] According to defendant, they had coffee at the neighbor's house around 9, 9:30, 10:00 a.m. Zoraida testified that they had coffee at their neighbor's house more than three hours after agents arrived, thus around 7:45-8:30 a.m.
[14] She further clarified that she lived with her mother in that residence until 11 years prior, so she knew defendant well, considered him her friend and knew defendant's parents. Also, defendant's wife Zoraida is her distant cousin. They socialize and go to church together.

vehicle with the handcuffs still on. After defendant exited the vehicle, she saw agents "place" defendant at his neighbor's house, across the road from his residence, together with his son and son in law. Luz testified that after a while, agents took their handcuffs off. Afterwards, defendant and his family went to Luz's mother's house to drink coffee. Luz testified that they drank coffee at around 9:00 a.m. and at around 10:00-10:30 a.m. an FBI agent arrived at her mother's house and arrested defendant.

Defendant raises two challenges in his suppression motion. He argues that he was interrogated by FBI agents in a custodial situation without advising him of his *Miranda* rights and he did not voluntarily and knowingly waive his *Miranda* rights during the interrogation. **ECF No. 207** at 7-10.

### III.    Legal Standard

To protect the Fifth and Fourteenth Amendment rights against self-incrimination, in *Miranda v. Arizona,* the Supreme Court ruled that police may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 479 (1966); *see also Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981). "[A]fter initially being advised of his *Miranda* rights, [an] accused may himself validly waive his rights and respond to interrogation." *Edwards*, 451 U.S. at 484. If a suspect is not warned about said rights, "the prosecution is barred from using statements

obtained during the interrogation to establish its case in chief." *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (citing *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)).

The Supreme Court has consistently held that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citing *Oregon v. Mathiason*, 429 U.S. 492 (1977). Also, case law is clear that *Miranda*'s warning requirements only apply to "custodial interrogation." *Newton*, 369 F.3d at 669 (citing *Miranda*, 384 U.S. at 444; accord *Thompson v. Keohane*, 516 U.S. 99, 101 (1995).

The First Circuit has held that "to find custodial interrogation, the court must first examine all the circumstances surrounding the exchange between the government agent and the suspect, then determine from the perspective of a reasonable person in the suspect's shoes whether there was 1) a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest and 2) express questioning or its functional equivalent." *United States v. Ventura*, 85 F.3d 708, 712 (1st Cir. 1996); *United States v. Swan*, 842 F.3d 28, 31 (1st Cir. 2016) (citing *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987)); *see also United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) (holding that "[t]he necessity vel non for Miranda warnings turns on whether a suspect is in custody.")

Any custody analysis must first ask "whether a reasonable person in the circumstances would have felt 'at liberty to terminate the interrogation and leave,'" *United States v. Rogers*, 659 F.3d 74, 78 (1st Cir. 2011) (citing *Keohane*, 516 U.S. at 112). The Supreme Court ruled that the

answer to this question relies on a "distinctly factual" inquiry into the circumstances surrounding the interrogation which in turn leads to the ultimate inquiry as to whether given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Keohane*, 516 U.S. at 112–13; *Beheler*, 463 U.S. 1121, 1125 (1983); *see also Hughes*, 640 F.3d at 435 (holding that the court must ascertain the circumstances surrounding the interrogation, which is integrally an assessment of the facts).

        If based on the facts, the answer is that a reasonable person would have felt at liberty to terminate the interrogation and leave, *Miranda* does not apply, and the challenged interrogation did not require advice of rights. *Newton*, 369 F.3d at 672. If, contrarily, a "reasonable person" would not have though himself free to leave, courts must inquire "whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id*. at 372 (citing *Beheler*, 463 U.S. at 1125). If this is so, then the person was "in custody" and *Miranda* applies. *Id*. (citing *Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984)). This determination is a mixed question of law and fact. *Keohane*, 516 U.S. at 112–13; *Hughes*, 640 F.3d at 435. It takes into account "the totality of the circumstances, and no one fact or circumstance is dispositive." *United States v. Richardson*, 36 F. Supp. 3d 120, 127 (D.D.C. 2014) (citing *Stansbury v. California*, 511 U.S. 318, 321–25 (1994)).

        In this context, the objective standard of a "reasonable person" "has the advantage — certainly from the perspective of the hundreds of thousands of law enforcement officers who must daily apply *Miranda*—of establishing a regular course of procedure. It does not require

officers to administer *Miranda* warnings based on a self-assessment of their actions as 'coercive'; rather, it instructs them to administer warnings whenever they place a person under formal arrest or apply restraints generally understood as comparable to those of a formal arrest." *Newton*, 369 F.3d at 671–72.

"The other component of custodial interrogation is, of course, interrogation." *Ventura*, 85 F.3d at 711–12. It "refers to both express questioning and its 'functional equivalent' which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id*. (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted); *see also Richardson*, 36 F. Supp. 3d at 127. The inquiry into this component "is objective: how would the officer's statements and conduct be perceived by a reasonable person in the same circumstances?" *Ventura,* 85 F.3d at 711–12.

It bears emphasis that the determination of whether custody exists "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Hughes*, 640 F.3d at 435 (citing *Stansbury*, 511 U.S. at 323). Thus, the interrogating officer's intent, not communicated to the individual being questioned, is irrelevant to the inquiry. *Id.* (citing *Berkemer*, 468 U.S. at 442. It requires a look at the totality of the circumstances and the subjective intent of the officer is relevant but not dispositive. *Richardson*, 36 F. Supp. 3d at 127 (citing *United States v. Sheffield*, 821 F.Supp.2d 351,

356 (D.C. 2011). Necessarily, if a defendant is in custody, the officers' express questions constituted interrogation. *Ventura,* 85 F.3d at 711–12.

The foregoing analysis follows the purpose of the Supreme Court's decision in *Miranda* of "preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Richardson*, 36 F. Supp. 3d at 128 (citing *Arizona v. Mauro*, 481 U.S. 520, 529–30 (1987)).

## IV.     Discussion

Defendant argues that he was "in custody" when FBI agents interviewed him and thus *Miranda* warnings were warranted at the beginning of the interrogation. Defendant proffers that he did not feel free to stop the interview and leave based on the following factors: the amount of agents that executed the search warrant; he and his family members were handcuffed while the residence was secured and he allegedly remained handcuffed during the interview by FBI agents; the street was blocked by law enforcement vehicles; the show of force by law enforcement; and he was "not invited to the car, or given a real option of not going to the car with the agents…" where he was interrogated. He further contends that he was forced by agents to sign the waiver of *Miranda* rights as a requisite to being able to leave the vehicle where he was being interrogated. **ECF No. 207 at 8**.

The government opposes defendant's characterization of the events and contends that various factors show that defendant was not subject to a custodial interrogation and thus *Miranda* warnings were not warranted *ab initio*. Specifically, they argue that the use of handcuffs

to secure persons during the execution of a search warrant nor a display of agents' weapons implicate custody under *Miranda*. Even so, the government points out that defendant was not handcuffed when he agreed to accompany the two agents to a vehicle where the interview ensued; the agents' questions did not call for facially incriminatory answers and their questions were incidental to the execution of the search warrant; the agents were cordial and polite, even offering water to defendant; and the agents informed defendant on at least two separate occasions that the interview was voluntary, that he was not under arrest, and that he was free to leave. **ECF No. 210** at 6-9. They further argue that as evidenced by Agent Feliciano's testimony, the agents did not coerce defendant to sign the *Miranda* waiver and his decision to sign the waiver as well as later terminate the interview were voluntary. *Id.* at 9.

The Court notes that there are no factual controversies as to the following matters: the validity of the search warrants issued for defendant's residence, cell phones and vehicle; the approximate time when law enforcement officers executed the warrant; the fact that the occupants of the residence were handcuffed upon entry into the residence by DEA SWAT agents and while the property was secured and cleared by the DEA SWAT team[15]; that the interview lasted approximately 45 minutes to an hour and upon conclusion of the interview, defendant exited Agent Feliciano's vehicle, walked to an area near his home with his family, went to his

---

[15] Except for defendant's wife, who admittedly was uncuffed shortly after when she went to the bathroom accompanied by two female agents and was never handcuffed again, even while being interviewed by two female agents inside an SUV near defendant's residence.

neighbor's house for coffee, and remained walking freely until he was actually arrested later that morning.

Defendant's and the government's versions of the events, however, diverge on several relevant factual matters: if defendant was handcuffed at the time Agents Feliciano and Marion approached him and during his interview in Agent Feliciano's car, whether defendant voluntarily went to Agent Feliciano's vehicle and whether defendant voluntarily signed the *Miranda* waiver during the interview, or he signed it upon coercion by the agents in order to be allowed to leave the vehicle where the interview was conducted.

**1. Defendant was not the subject of a custodial interrogation.**

The first step of this Court's analysis requires a finding as to whether defendant was "in custody" for purposes of *Miranda*. As noted above, following Supreme Court precedent, the First Circuit has identified several factors to consider in determining whether a reasonable person would have felt at liberty to terminate an interrogation and leave. These include whether the suspect was questioned in familiar or at least neutral surroundings; the number of law enforcement officers present at the scene; the degree of physical restraint placed upon the suspect; and the duration and character of the interrogation. *Swan*, 842 F.3d 28, 31 (1st Cir. 2016) (first citing *Masse*, 816 F.2d at 809, then citing *Hughes*, 640 F.3d at 435 and then citing *Ventura*, 85 F.3d at 711). This requires a factual inquiry as to the circumstances surrounding the presumptive interrogation. *Keohane*, 516 U.S. at 112–13. If, based on the facts, the answer is that a reasonable

person would have felt at liberty to terminate the interrogation and leave, then *Miranda* does not

apply, and the challenged interrogation did not require advice of rights.

### a. Degree of physical restraint

Defendant argues that FBI agents "took him" to an SUV and that he did not feel free to

leave because he was handcuffed while he was presumptively interrogated by the agents. It is

well settled that handcuffs are one of the most recognizable hallmarks of a formal arrest. *United*

*States v. Maguire*, 359 F.3d 71, 79 (1st Cir. 2004). Accordingly, this factor carries a lot of weight in

determining whether he was "in custody." After careful review of the witness' testimony, the

Court finds that defendant was not wearing handcuffs when he was interviewed by the FBI

agents.

As noted above, defendant testified that incidental to the execution of the search

warrants, agents came into his residence through the carport door, whereupon he was thrown

to the ground and handcuffed by agents. That after he was cuffed, the agents lifted him up, got

him out of the door of his residence and took him to an SUV in front of his residence, where

they asked him some questions. This version of the facts places the presumptive interrogating

agents Feliciano and Marion inside the residence. In fact, defendant's testimony suggests that

said agents threw him on the ground, handcuffed him inside the residence and took him to the

vehicle presumably by force, still wearing handcuffs. The evidence, however, shows otherwise

and discredits defendant's credibility on this issue.

First, Agents Feliciano and Marion are FBI Special Agents and were not part of the DEA SWAT team that breached the residence and handcuffed the occupants while the residence was cleared. Agent Feliciano testified about his role in the execution of the search warrant as team leader and expressly noted that he was responsible for guarding the perimeter and did not participate or visually observed the actual beach of the residence. Agent Feliciano also testified that after the residence was secured, he toured the interior and when he exited the house, he saw defendant and various occupants standing in front of the residence's carport and none of them were handcuffed.[16] Thus, there is no evidence showing that as defendant proposed, Agents Feliciano and Marion were the ones that threw him on the ground, handcuffed him and took him to an SUV to interrogate him.[17]

This is further confirmed by Agent González who testified that the DEA SWAT team breached and secured the residence, that he saw when Agents Feliciano and Marion approach and initiate a conversation with defendant after the residence was cleared, and that the three of them moved to and got into a vehicle near defendant's residence. Agent González noted that at that time defendant was not wearing handcuffs. In fact, he testified that he witnessed when the occupants of the residence were uncuffed by agents soon after the residence was cleared. Thus, Agent González's testimony confirms that defendant was not wearing handcuffs by the time the

---

[16] Agent Feliciano's testimony coincides with Agent Gonzalez's statement that he first saw defendant in the carport area after the DEA SWAT team had told FBI agents the scene was secure, and he saw when defendant was uncuffed.
[17] Defendant's neighbor testified that she saw agents "take" defendant to a vehicle but she did not state that said agents threw him to ground and handcuffed him. Also, she did not testify that he was specifically taken to an SUV; instead she broadly stated he was taken to a vehicle.

two agents from the FBI approached him and that defendant voluntarily walked with the agents to the vehicle near defendant's residence.

Second, although it is clear defendant and the residence's occupants were handcuffed incidental to the search of the residence, this does not automatically implicate that defendant was in custody during the interview with agents. This practice is consistent with the Supreme Court's holding in *Mich. v. Summers*, 452 U.S. 692, 702 (1981), that law enforcement officers are granted limited authority to detain occupants of a home during a lawfully executed search warrant for the amount of time necessary to complete the search. This prevents a suspect from fleeing the scene, ensures protection of the agents and the evidence, and facilitates an efficient and orderly search. *Id*. Thus the fact that defendant was handcuffed during the execution of the search warrant does not have any bearing on whether he was in custody during the interview with FBI agents.

Similarly, defendant's allegations that the "show of force from the law enforcement agents", handcuffing the occupants and blocking the street during the execution of the warrant support a finding that he was in a custodial interrogation are unavailing. *See United States v. Swan*, 842 F.3d 28, 31–32 (1st Cir. 2016) (citing *United States v. McCarty*, 475 F.3d 39 (1st Cir. 2007)) (denying suppression of statements made by defendant who had been handcuffed only minutes beforehand upon concluding that although defendant had been "in custody" while restrained, the situation became non-custodial by the time that the questioning began because the officers had taken off the defendant's handcuffs and "explained ... that he was not under arrest, that he

was free to leave at any time, and that he did not have to answer any questions"); *Hughes*, 640

F.3d at 436 (finding there was no show of force where only two agents carried visible weapons

that remained in their holsters).

After carefully considering the testimony heard during the evidentiary hearing, the Court

does not credit Luz's testimony that defendant was handcuffed when interviewed by agents.[18]

Her testimony is wholly supported by the proposition that she stood at the second-floor balcony

for an uninterrupted span of two hours and had clear visibility over all that occurred that

morning of November 8, 2017.[19] However, the allegation that she stood in the balcony for two

hours without interruption from approximately 4:45 to 6:45 a.m. is disproven by the photograph

taken by the FBI at the time of the execution of the search warrant, where the sky is still dark,

and the balcony appears empty of any persons observing the area. **Gov't. Ex. 18**.[20]

This is further compounded by the fact that despite admitting that there was little to no

light at 5:15 a.m., Luz insisted that she saw all the occupants taken to different vehicles at the

same time in different directions, even the vehicle where Zoralis was taken which per her own

description was "far away". There is no dispute that it was still dusk at the time agents arrived

and there was little light out at the time of the execution of the search warrants. Especially

---

[18] The fact is that Luz is the only witness – aside from defendant himself - to testify that defendant was wearing handcuffs at the time that he entered and exited the vehicle for the interview with the FBI agents. Defendant's wife, Zoraida, never saw defendant after the initial breach of the residence.

[19] The Court notes that Luz testified that when she went to the balcony, agents told her to get back inside evidently for safety reasons, and she stated that she "stayed [outside] because I was at my house, because in my opinion, I wasn't obstructing anything."

[20] The parties stipulated that the pictures were taken the morning the warrant was executed.

considering that at the time, the area – as well as most of the entire island - was still without power in the aftermath of Hurricane Maria and operating mainly on generators. Indeed, Zoraida and Luz admitted that they were using power generators on that date. Thus, all the evidence shows that the area was dark, impeding full visibility. Even Zoraida's assertion that the carport lights were turned on were rebutted by pictures taken at the time of the execution of the warrant, wherein only one light appears on and the rest of the lights in the carport are turned off. *See* **Def. Ex. F; Gov't Ex. 16, 17**.

As to Luz's contention that she saw a "reflection" of defendant being thrown on the floor, handcuffed and "taken" to the agent's vehicle, the Court notes that the exhibits submitted by the parties show that in addition to poor lighting, her visibility from the second floor balcony of her mother's home was obstructed by a palm tree located next to the defendant's residence's carport and a partial wall that obstructed her view to the residence's carport area and door. Various vehicles in the carport at the time of the execution of the search warrants, including defendant's red Chevrolet Silverado pickup, also blocked or obstructed her view. Most importantly, there is no possibility that Luz had visibility into the interior of the residence where, pursuant to defendant and Zoraida's testimony, agents entered the home through the carport door, pushed Zoraida aside, threw defendant on the floor and handcuffed him. *See* **Gov't Ex. 15-18**; **Def. Ex. F**. Consequently, it is difficult to believe that she saw a "reflection" of defendant being thrown to the floor and handcuffed while on the floor, in an ill lit scene and

from a balcony that has absolutely no view into the interior of defendant's residence. *See* **Gov't**

**Ex. 2, 17-18**.

Similarly, it is highly incredible that Luz saw defendant taken outside the residence by

agents through the carport area between the red Silverado pickup and the other vehicles parked

there, which clearly impeded full view into the carport area, and was able to observe in detail

whether they were wearing handcuffs or not. Especially considering that all the defense's

witnesses conceded that the warrant was executed at 4:45-5:00 a.m. while it was dark outside.

Luz's statements even conflict with defendant's testimony that when the interview ended,

agents opened the door, uncuffed him and he walked back to his family. According to Luz,

defendant was "placed" by the agents with his family members in front of their neighbor's

house, and they were all later uncuffed. Consequently, the Court finds that Luz's testimony

seemed exclusively tailored to support the proposition that defendant was handcuffed at all

times and simply lacked credibility.[21]

Lastly, Defendant's testimony as to signing the *Miranda* waiver during the interview and

how he drank the bottle of water provided by Agent Feliciano proved especially persuasive on

this Court's conclusion. When questioned how he drank the bottle of water provided by Agent

Feliciano – whether he drank it himself or the agents helped him drink it because he was

---

[21] Luz's testimony that all occupants, except Zoraida, were handcuffed when interviewed also lacks credibility. Zoraida only saw her son handcuffed inside while agents secured the residence and saw when defendant was handcuffed upon entry of the agents into the residence. There is no other evidence, aside from Luz's testimony showing that the occupants remained handcuffed beyond the time when the DEA SWAT team cleared the residence.

purportedly wearing handcuffs in the back, defendant initially hesitated and then stated that he drank it on his own, lifting his hands as if he held the water bottle while his hands were handcuffed in the front. Likewise, defendant testified that he signed the *Miranda* waiver at some point inside the vehicle, while still wearing handcuffs purportedly in the back. This is simply unbelievable.

Defendant never proffered that the agents readjusted the handcuffs to the front when he entered the vehicle or while inside the vehicle. Even so, Agent Feliciano explained that people are not handcuffed in the front because it poses a risk for themselves as well as the agents conducting the operation. More importantly, defendant, Zoraida and Luz testified that defendant – and all other occupants of the residence except for Zoraida – were handcuffed in the back during the execution of the search warrant. Even Luz when questioned on this point affirmed that defendant wore the handcuffs in his back and never noted that defendant wore them in the front when he was taken to the vehicle or when she purportedly saw him exit the vehicle and placed by agents across the street from his residence with the rest of his family members.

Consequently, here the totality of the evidence and circumstances show that the occupants were uncuffed soon after the residence was cleared by the DEA SWAT team and that defendant was not wearing handcuffs by the time Agents Feliciano and Marion approached him. Likewise, defendant agreed to talk to agents and voluntarily walked with the agents to Agent Feliciano's 4-door sedan located 30-50 yards to the right of defendant's residence. As

such, the degree of physical restraint or restrain on freedom of movement in this case was not

akin to an arrest.

**b.  The location of the interview**

Defendant argues that he was not interviewed in a familiar or neutral setting. **ECF No.**

**207** at 9. There is no dispute that defendant was interviewed inside Special Agent Feliciano's

vehicle, which was parked in his street, 30-50 meters away from his residence. Questioning of a

suspect in a police vehicle, however, does not automatically render such suspect in custody.

Various factors are relevant to this inquiry such as whether the car was unmarked, the suspect

was physically restrained, whether the car was in a public or familiar place, the length and tone

of interview and the number of officers conducting it. *See United States v. Ocean*, No. 15-CR-

00040-JAW-09, 2016 U.S. Dist. LEXIS 75216, at *25-28 (D. Maine 2016); (citing *States v. LeBrun*,

363 F.3d 715 (8th Cir. 2004) (suspect not "in custody" when he was questioned for brief period

in backseat of sheriff's car outside his home, he was not handcuffed, there was no evidence he

was unable to open car doors, he did not invite officers into his home upon arrival despite rain,

and he willingly sat in sheriff's car); then citing *United States v. Rainbow*, 380 F. Supp. 2d 1071,

1078-79 (D.N.D. 2005) (18-year-old suspect not "in custody" during questioning in unmarked

sport utility vehicle parked in his driveway when (i) he was informed at outset he was not in

custody or under arrest, would not be arrested and could terminate interview at any time, (ii)

he was not handcuffed, escorted or placed into vehicle but rather walked out of his home

without restraint and got into it, (iii) doors to vehicle were unlocked and (iv) interview was cordial and voluntary).

An analysis of such factors in this case tilt a finding in the government's favor. Agent Feliciano testified that he asked defendant to accompany him to his vehicle to make sure that he felt relaxed, comfortable and not in a custodial situation. This proposition finds support in the fact that the FBI was conducting a search of defendant's residence and talking defendant to the vehicle guaranteed less hustle of agents around them. Agent Feliciano's vehicle was unmarked, parked in a public street, and in a familiar setting, namely, near defendant's home. Defendant was not wearing handcuffs and voluntarily agreed to speak to agents. When defendant decided to end the interview, he admittedly exited the vehicle, without handcuffs, and walked freely to join his family members across the street from his residence. Afterwards, defendant remained free to walk about the street. This is confirmed by Agent González who saw defendant sitting on a chair in the house across from his, with his family and without handcuffs. Indeed, defendant, Zoraida and Luz testified that they went to Luz's mother's house between 9-10:00 a.m.[22] to drink coffee. Therefore, the Court finds that the interview was conducted in a familiar setting.

---

[22] There are discrepancies as to the specific time when they allegedly went to Luz's mother's house to drink coffee but not as to the fact that they did.

### c. Number of law enforcement agents, character and duration of the interview

Pursuant to the witnesses' testimony, the interview was conducted by only two agents, who were not carrying long guns or gear and whose weapons remained in their holsters. *See Swan*, 842 F.3 at 32–33; *Hughes*, 640 F.3d at 436 (finding defendant was in custody where two agents questioned him, and their weapons remained in holster). There is no evidence suggesting that defendant was hauled away to that location or not well-treated during the interview which lasted approximately an hour, a very short amount of time in this context. *See Swan*, 842 F.3 at 33; *Hughes*, 640 F.3d at 437 (90-minute interview was not custodial); *Beckwith v. United States*, 425 U.S. 341, 342–43 (1976) (concluding that three-hour interview in suspect's home did not implicate Miranda). There is also no evidence that any of the officials aggressively questioned defendant, raised their voices or otherwise attempted to coerce his waiver through threats or physical force.

Defendant never alleged that the agents were physically aggressive or threatening and he admitted that Agent Feliciano offered him a bottle of water. *See Hughes*, 640 F.3d at 437 (finding that a non-confrontational interview and agents' calm demeanor are entitled to some weight in determining whether an interrogation is custodial), and later on, a gum stick. The fact that defendant was the target of an investigation was not sufficient to entitle him to *Miranda* warnings. *See United States v. Pagan-Santini*, 451 F.3d 258, 263 (1st Cir. 2006) (finding that defendant was not in custody where his interview lasted nine hours and being a target of the government investigation alone would not entitle him to Miranda warnings).

Although defendant asserts that he felt coerced into talking to the FBI agents, the standard on this point is objective and not subjective. The Court finds that defendant's testimony lacked credibility, especially considering the rehearsed and repetitive mention of the effects of seeing his family handcuffed, his ninth-grade education, purportedly non-existent reading skills[23] and overall recitation of the allegations in his motion to suppress, compounded by contradictions in his statement of the facts. It is untenable that a defendant would have understood the situation as the functional equivalent of formal arrest when he entered the vehicle voluntarily, the vehicle was 30-50 meters away from his home and parked on his street, he was not under arrest or handcuffed, was informed that he was not under arrest and that he was free to leave, the agents never threatened him or treated him aggressively, and who sat in the FBI agent's vehicle where he was given water and left the vehicle of his own will by walking out freely at the time he decided to conclude the interview. *See Swan*, 842 F.3 at 32; *United States v. Begay*, 310 F. Supp. 3d 1318, 1359-1360 (D. New Mexico 2018); *Ocean*, 2016 U.S. Dist. LEXIS 75216, *26-33 (holding that defendant was not in custody where he voluntarily went with agents to an unmarked car within view of defendant's residence, the interview lasted 25 minutes, there was no evidence that agents raised their voices or argued with defendant, and defendant let himself out of the vehicle and walked back to his home).

---

[23] At the hearing, upon further questioning, defendant conceded that he did know how to read albeit it is difficult for him and he reads slowly. Moreover, Agent Feliciano read defendant the form with the *Miranda* rights.

Various statements by defendant are entirely inconsistent with the government's, and his own witness' and thus, fail to persuade the Court. For instance, defendant testified that he was "taken" to and interrogated in an SUV located in front of his neighbor's house. This contradicts the statements of Agents Feliciano and González that after getting his consent, they walked with defendant to a vehicle – not an SUV -, situated 30-50 meters away from his residence. Even Luz confirmed that defendant was taken to a vehicle located to the right of defendant's home and some distance away; she did not describe him as being dragged or hauled to the vehicle against his will. Defendant also stated that upon exiting the SUV he saw his wife and son in law in front of his neighbor's house. This description of the events contradicts his wife, Zoraida's testimony. Zoraida testified that after being interviewed for 45-50 minutes inside an SUV, she exited the SUV and she saw defendant, her son in law and son standing in front of their front neighbor's house, without handcuffs. Evidently, both versions collide as to who joined their relatives first and thus the timeline of events.

The fact remains that defendant was not handcuffed, attended of his own accord to the vehicle with agents, left when he told the agents he wanted to end the interview, the interview lasted less than an hour, took place in an unmarked vehicle with two agents, and the officers were polite, cordial and even offered defendant water. As the Supreme Court noted in *Mathiason*, 429 U.S. at 495, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *See*

*also Beheler*, 463 U.S. at 1124 ("[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it…") Thus, even if the Court deemed Agent Feliciano's car in this context as a "coercive environment" – which is not the case -, a non-custodial situation is not converted into one simply because questioning takes place in a coercive environment. The threshold of physical control, duration and character of the interrogation, location and number of agents required for a finding that defendant was in a custodial situation is not met here. The same conclusion applies even considering that defendant was the one police suspected or knew a lot of information about his past. *Beheler*, 463 U.S. at 1125.

A careful consideration of the totality of the circumstances shows that defendant was at liberty to terminate the interrogation and leave and thus, weighs against suppression. Since the Court finds defendant was not in custody, the *Miranda* inquiry ends here, and we need not delve into defendant's allegations regarding an allegedly involuntary waiver of his *Miranda* rights.

Even so, it is clear from the record that upon learning of his prior conviction, Agent Feliciano read defendant his *Miranda* rights and defendant signed the waiver freely and voluntarily. Defendant's contention regarding poor reading skills are insufficient when agents read the contents of the *Miranda* waiver aloud to defendant. The Court is not persuaded by defendant's testimony that agents did not read him his *Miranda* rights during the interview or that his waiver was coerced. Likewise, there is no credible evidence to support defendant's contention that agents told him that he could not leave until he signed the *Miranda* waiver or

that he was only allowed to leave after he signed the waiver. Contrarily, the totality of the circumstances show that defendant was not the object of any police coercion or trickery.

The Court lends credibility to Agent Feliciano's testimony that upon defendant's admission of a prior conviction, he read defendant the contents of the *Miranda* waiver (FD-395 form), in the Spanish language. *See* **Gov't Ex. 4**. Agent Feliciano contemporaneously noted the time when he read the content of the waiver to defendant, defendant signed the waiver and both Agents Feliciano and Marion signed the form. *Id.* Agent Feliciano even made a note as to the time when defendant requested to stop the interview. *Id.* Accordingly, defendant knew that "he may choose not to talk to law enforcement officers, and to talk only with counsel present, or to discontinue talking at any time." *United States v. González-Seda*, 224 F. Supp.3d 128, 152 (D.P.R. 2016) (citing *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). Even so, he decided to continue the interview. Thus, defendant knowingly and voluntarily waived his *Miranda* rights. *See González-Seda*, 224 F. Supp. at 152 (finding that for waiver to be knowing and intelligent, the suspect need not "know and understand every possible consequence of a waiver of the 5th Amendment privilege." (citations omitted)).

Defendant's argument that *Missouri v. Seibert*, 542 U.S. 600 (2004) applies here is also misplaced. There, "the police employed a deliberate practice of obtaining a confession first without a Miranda warning; administering the warning; and then re-eliciting the confession using the prior inadmissible confession as a lever." *United States v. Jackson*, 608 F.3d 100, 104, 1st Cir. 2010). The Supreme Court held that the delayed *Miranda* warnings were ineffective, and the

later statement was inadmissible. *Id.* The facts in *Seibert*, however, are clearly distinguishable from this case. After being awakened at 3 a.m., Seibert was taken to the police station and systematically interrogated for 30 to 40 minutes without *Miranda* warnings about her role in a crime resulting in a young teenager's death. *Id.* (citing *Seibert*, 542 U.S. at 604-05). After defendant made a crucial admission, she was given a break, *Miranda* warnings were administered, and Seibert was immediately confronted with her pre-warning statements to extract the more elaborate conforming admissions. *Id.* Aside from the fact that defendant here was not in custody, and thus *Miranda* was never triggered, there was no planned tactic, systematic initial interrogation or deliberate use of the initial statements to secure ones made after defendant signed the waiver. *Jackson*, 608 F.3d at 104.

**V.     Conclusion**

Since Defendant was not subjected to a custodial interrogation, *Miranda* warnings were not required, and defendant's statements are admissible. Accordingly, defendant's motion to suppress at **ECF No. 207** is **DENIED**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 28th day of February, 2020.

S/AIDA M. DELGADO-COLÓN
**United States District Judge**